UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

**W.S., a minor child,**
**By and through his parents and guardians,**
**D.S., and C.E., and D.S. and C.E., individually,**

**Plaintiff,**

**Case NO. __________**

**v.**

**JURY TRIAL DEMANDED**

**SUMNER COUNTY BOARD OF EDUCATION (a/k/a SUMNER COUNTY SCHOOLS), a public entity; and BRANDON SMART, individually.**

**Defendants.**

# COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

**Plaintiff W.S., by and through his parents, D.E. and C.E., and D.E. and C.E. individually,** bring this action against Defendants, SUMNER COUNTY BOARD OF EDUCATION (a/k/a Sumner County Schools), a public entity; and BRANDON SMART, individually. They allege as follows:

## I. NATURE OF THE ACTION

1. This case involves a school district's failure to timely provide behavioral modifications for a five-year-old with autism. Without the modifications, the five-year-old did engage in maladaptive behavior toward others. But thereafter, an assistant principal, Brandon Smart, pursued actions of pure vengeance against the five-year-old child and his parents, as detailed herein. The defending parties are responsible for the resulting damages.

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including Title II of the ADA, 42 U.S.C. § 12131 et seq., Section 504 of the Rehabilitation Act, 29 U.S,C. §794, and 42 U.S.C. § 1983.

3. This Court has supplemental jurisdiction over any related state-law claims under 28 U.S.C. § 1367(a).

4. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District and Defendants reside or operate within this District.

## III. PARTIES

5. Plaintiff D.S. and C.E. are the parents, father and mother, respectively, of W.S. ("W"), a minor child with a disability. They reside together in Sumner County at 200 Sheffield Drive, White House, Tennessee 37188.

6. W. is a five-year-old child with autism spectrum disorder, a disability within the meaning of the ADA, 42 U.S.C. § 12102, who at all relevant times was enrolled as a kindergarten student in the District.

7. Defendant SUMNER COUNTY BOARD OF EDUCATION (a/k/a Sumner County Schools) is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1), and receives federal financial assistance. The District operates the school W. attended.

8. Defendant Brandon Smart is an individual citizen who, at all times, was employed by the District as an assistant principal. He resides within Robertson County.

## IV. FACTS

9. W. is a five-year-old child diagnosed with autism spectrum disorder. W. has a "disability," as that term is defined by the ADA and Section 504, because his medical impairment, autism, substantially impairs W.'s major life activities of social communication, interacting with others, emotional regulation, and neurological functioning.

10. W.S. began kindergarten at H.B. Williams Elementary School during the 2025-2026 school year, part of Sumner County's Board of Education ("the District").

11. Before enrolling, W.'s parents advised the School District of the nature of W.'s disability, Autism, and, particularly how, despite being high-functioning in many respects, he has serious difficulties regulating his emotions. The parents advised the School District that these behaviors could be serious and severe, that W. can spiral or be violent, and throw punches.

12. The parents requested a full-time one-to-one aide and appropriate behavioral supports as reasonable modifications and behavioral services. The parents offered experiences, including how he was assisted in this fashion in preschool, and how the ABA provider suggested a 1:1 to manage behaviors in the classroom. Additionally, behaviors were documented in Sumner County's Pre-K assessment—completed in December of 2024-January 2025.

13. The School District declined to provide the reasonable modifications at that time. It explained that it wanted its *own* evidence, or data, on the need (i.e. him spiraling, injuring, or actually trying to hurt someone) before providing the modifications.

14. Without the requested support, in August of 2025, W. experienced a number of events of harm to self or others. As a result, W.'s parents again requested full-time one-to-one assistance and behavioral intervention.

15. On or about September 3, 2025, W. again engaged in harmful conduct toward others. At that point, September 3, 2025, the School District finally agreed to increase the behavioral supports including 1:1 aide.[1]

---

[1] The provision of the requested supports including increased access to an aide was *eventually* successful. Accordingly, W. is not making a claim for violation of the IDEA or the denial of a free appropriate public education because, again, the full time aide was provided albeit late. Thus, W. did continue making adequate progress and passed to firs grade. This case, by contrast, involves

16. By that date, September 3, 2025, due to disability, W. had *already* engaged in pushing, shoving, or throwing objects at other children—and, understandably, those actions by W. had already greatly upset some parents of other children, whom the School District had informed.

17. On September 3, 2025, a PTA Vice President (now President), a parent of a child in the classroom, sent an alarming and emotional Facebook message to all parents claiming in writing that her child was "assaulted" and "punched;" she blamed school laws protecting children with disabilities and blamed a lack of school resources.

18. In response this message, an "assistant principal in this district," described as such in the response, stated that the PTA President should contact the School Resource Officer and "also go to your local police department and inquire about filing charges." The assistant principal explained that, even if the SRO did not file charges, parents themselves can.

19. On or about September 4, 2025, School Resource Officer Larry Burke made the decision, after speaking to other parents, including the PTA President, that he would charge W., five years old with Autism, with *aggravated assault*, a felony. The charge arose from W. allegedly throwing items at other students and causing injury. The children were seen by the school nurse and returned to class, along with W.

20. Officer Burk's charges didn't stick. The District Attorney's Office independently reviewed the charges referred by Officer Burk and declined to file any charge against W. No prosecutor ever endorsed, ratified, or independently determined that probable cause supported the felony charge Officer Burk lodged. As Officer Burk's own notes reflect: "my petition request was rejected by both the Sumner County Juvenile Court, Juvenile Court Judge and the Sumner County District Attorney's Office."

---

a different type of relief altogether—*damages* flowing from the delay in providing the requested modification.

21. However, Burk would advise W.'s parents that *parents of other children* could still file on their own. And sure enough they did, including the PTA President and an assistant principal within the District.

22. On or about September 12, 2025, Brandon Smart, the assistant principal at Liberty High School, with two children in W.'s classroom, filed a petition in juvenile court against W. Additionally, the aforementioned PTA parent filed a separate petition in juvenile court against W. With these petitions, these persons alleged that W. had harmed their own children during the period in which the District failed to accommodate W.'s behaviors. These petitions required W.'s parents to retain and pay legal counsel.

23. On October 14, 2025, W. and his parents appeared for a preliminary hearing in juvenile court. W., through his parents' judgment, declined to have W., five years old and with a disability, sign a statement that he understood his rights and was competent to proceed.

24. Defendant Smart, who *knew* of W.'s disability and age, insisted that he wanted his charges heard. The PTA President, by contrast, decided not to pursue the petition any further, and hers was dismissed.

25. On November 10, 2025, W.'s parents appeared again in juvenile court, as did Defendant Smart. Defendant Smart, with his actual and apparent authority as an assistant principal, claimed that he knew how IEPs worked and that, if the juvenile charges were upheld, he could have W. removed from school—his goal. Representing himself, and with no district attorney, he demanded the case move forward to include W. being put through a forensic evaluation for capacity.

26. Thereafter, November 11, 2025, W.'s parents advised Defendant Smart, in writing, that they would not remove W. from school and that, since the early events in 2025, the appropriate

behavioral accommodations had been put in place. Smart persisted in his claim against W. anyway.

27. On or about February 2, 2026, and again on March 3, 2026, W.'s parents appeared again in juvenile court, as did Defendant Smart. The results of the forensic evaluation showed the obvious: that W., five years old and with Autism, was not competent. Defendant Smart demanded a personal cross-examination of the forensic examiner and an opportunity to present other evidence.

28. On or about April 27, 2026, W.'s parents appeared again in juvenile court, as did Defendant Smart. Smart presented no evidence to challenge the forensic evaluation and, finally, at long last and after much expense, Smart's petition was dismissed.

29. At all relevant times, Smart knew that W.S. was five years old, knew that he was autistic, knew or had reason to know that the alleged conduct occurred during disability-related dysregulation, knew or had reason to know that the aggravated-assault theory had previously been rejected by juvenile authorities, and knew that W. had obtained behavioral supports.

30. Smart used the juvenile process to attempt an educational-placement consequence—removal from school of W. His dogged pursuit in spite of known facts, would deter a reasonable parent from requesting public school inclusion, disability accommodations or supports, or advocating for a child's continued inclusion in public education.

31. The District knew or should have known that Smart was invoking his school position in connection with the petition, claiming by virtue of his *position* that he was an authority on IEPs, discipline, and consequences.

32. The failure to provide the requested behavioral supports was a substantial factor in the behavioral crisis that followed. The crisis was the precise kind of event the parents had warned would occur without support.

33. The resulting injury to classmates, as claimed, and ensuing school-connected referrals or petitions were reasonably foreseeable consequences under the circumstances, particularly after District personnel advised parents to seek out criminal or juvenile charges for disability-related classroom conduct.

34. As a result of Defendants' conduct, W.S. stigma, anxiety, and emotional injury. His parents incurred legal and related expenses, lost time, and suffered injuries arising from their advocacy on W.'s behalf.

## V. CLAIMS FOR RELIEF

### COUNT I - TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### Against the Sumner County Board of Education

35. Plaintiffs incorporate the preceding allegations.

36. W.S. is a qualified individual with a disability, and the Board is a public entity subject to Title II.

37. The Board knew of W.S.'s disability and knew that one-to-one behavioral assistance, assessment, planning, or comparable supports were necessary to afford him meaningful and safe access to public education.

38. The Board failed to timely make reasonable modifications and failed to provide disability-informed supports despite specific advance notice of the predictable consequences. The requested modifications would not have fundamentally altered the District's educational program.

39. The Board stood by, as its own assistant principal, subjected W.S. to criminalizing practices arising from his disability. It made no efforts to protect W. from its assistant principal's grotesque actions.

40. The Board acted intentionally or with deliberate indifference after an official with authority to address the discrimination had actual knowledge of a substantial likelihood that W.'s federally protected rights would be harmed and failed to act.

41. The Board's violations caused pecuniary loss and other compensable injury, and warrant declaratory and prospective injunctive relief.

**COUNT II - SECTION 504 OF THE REHABILITATION ACT**
**Against the Sumner County Board of Education**

42. Plaintiffs incorporate the preceding allegations.

43. The Board receives federal financial assistance, and W.S. is otherwise qualified to participate in its educational programs.

44. Solely by reason of disability, the Board denied W.S. meaningful access to appropriate behavioral supports and subjected him to discriminatory exclusion for the foreseeable manifestations of the disability it failed to accommodate.

45. The Board had actual knowledge of the requested accommodation and the likely harm from withholding it, yet failed to act. Plaintiffs seek legally available equitable relief, pecuniary damages, but do not seek emotional-distress damages under Section 504.

**COUNT III - FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983**

**Against Brandon Smart Individually**

46. Plaintiffs incorporate the preceding allegations.

47. D.S. and C.E. engaged in protected speech and petitioning activity by requesting services, criticizing or challenging the District's failure to provide disability accommodations, and advocating for their child's educational rights. And they made known their efforts to Smart.

48. Acting under color of state law, Smart took adverse action by initiating and prolonging juvenile proceedings and invoking his school authority to threaten or seek W.S.'s educational removal. He caused emotional harm, humiliation, and stigma to W.S.

49. Smart's conduct would deter a person of ordinary firmness from continuing to advocate for disability services. The protected advocacy was a substantial or motivating factor in Smart's actions, as shown by the chronology, his knowledge, and his placement objective.

50. Smart's conduct caused D.S. and C.E. personal pecuniary and nonpecuniary injury. His actions violated clearly established First Amendment principles, subject to proof concerning his governmental role and motive.

**COUNT IV - EQUAL PROTECTION, 42 U.S.C. § 1983**

**Against Brandon Smart Individually**

51. Plaintiffs incorporate the preceding allegations.

52. Acting under color of state law, Smart intentionally treated W.S. adversely because of autism and conduct directly associated with autism-related dysregulation. He knew the claims were unfounded owing to disability of a five year old with autism, but pushed prosecution anyway.

53. Smart pursued a juvenile adjudication to obtain an exclusionary educational consequence, despite knowing W.S.'s age, disability, support needs, and the prior rejection of the proposed aggravated-assault petition.

54. Smart's discriminatory use of governmental authority lacked a rational relationship to a legitimate educational purpose and was motivated, at least in substantial part, by a purpose to remove a disabled child rather than provide individualized support.

55. Smart's actions caused W.S. compensable injury. Plaintiffs seek damages from Smart individually, including punitive damages upon proof of reckless or callous indifference.

**COUNT V - FOURTH AMENDMENT MALICIOUS PROSECUTION, 42 U.S.C. § 1983**

**Against Brandon Smart Individually**

56. Plaintiffs incorporate the preceding allegations.

57. Acting under color of state law, Smart made, influenced, or participated in the decision to commence and continue the juvenile proceeding against W.S.

58. The proceeding, against a five-year-old with autism, caused W.S. to submit to compulsory court appearances and a court-directed forensic evaluation and otherwise restrained his liberty beyond the burdens inherent in an unfiled accusation.

59. The proceeding terminated without an adjudication of delinquency or guilt when Smart's petition was dismissed.

**60.** Smart's conduct caused compensable injury and violated W.S.'s Fourth Amendment rights.

**COUNT VI - MALICIOUS PROSECUTION UNDER TENNESSEE LAW**
**Against Brandon Smart Individually**

61. Plaintiffs incorporate the preceding allegations.

62. Smart initiated and continued a juvenile delinquency proceeding against W.S.

63. Smart acted maliciously or for a purpose other than bringing W.S. to justice, including the collateral purpose of obtaining or facilitating removal from school.

64. The proceeding terminated in W.S.'s favor when the petition was dismissed without an adjudication against him.

65. The proceeding caused damages, including reasonable defense-related expenses, loss of time, stigma, and other legally recoverable injuries to W. and his parents.

**COUNT VII - ABUSE OF PROCESS UNDER TENNESSEE LAW**

**Against Brandon Smart Individually**

66. Plaintiffs incorporate the preceding allegations.

67. Smart used regularly issued juvenile process for an ulterior and collateral purpose: obtaining or facilitating W.S.'s removal from his public-school placement and deterring his parents' disability advocacy.

68. After filing, Smart committed acts in the use of process designed to accomplish that collateral objective, including invoking his school-administrator authority, connecting juvenile adjudication to school removal, demanding continuation after the forensic conclusion, and requiring additional process without presenting evidence sufficient to challenge that conclusion.

69. The use of juvenile process to obtain an educational-placement result was not a proper purpose of the delinquency proceeding and caused legally recoverable damages.

**COUNT IX - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against Brandon Smart Individually**

70. Plaintiffs incorporate the preceding allegations.

71. Smart's alleged course of conduct—using or purporting to use public-school authority to pursue a five-year-old autistic child through repeated juvenile proceedings for the stated purpose of facilitating school removal, and persisting after a forensic finding of incompetence—was intentional or reckless.

72. Taken as a whole and subject to proof from the transcripts and records, the conduct was so extreme and outrageous that it exceeded the bounds of decency tolerated in a civilized community.

73. The conduct directly caused mental injury to W.S. and his parents.

## VI. PRAYER FOR RELIEF

74. Wherefore, Plaintiffs request a declaration that the Board violated Title II, Section 504, and that Smart violated the federal rights to be established at trial.

75. Plaintiffs request declaratory relief, compensatory damages where ever legally recoverable, and pecuniary and other injuries against the responsible Defendants.

76. Plaintiffs request punitive damages against Smart on the constitutional and state-law claims to the extent permitted by law.

77. Plaintiffs request reasonable attorneys' fees and costs under 42 U.S.C. §§ 12205 and 1988 and any other applicable authority, together with pre- and post-judgment interest.

78. Plaintiffs request all additional relief the Court deems just and proper.

## VII. JURY DEMAND

79. Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com